1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **E. & J. GALLO WINERY,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**CANTINE RALLO, S.p.A.,**<br><br>**Defendant.** | **1:04-cv-5153 OWW DLB**<br><br>**ORDER RE: REQUEST FOR RECONSIDERATION OF MAGISTRATE JUDGE'S RULING, PURSUANT TO LOCAL RULE 72-303(c) and 28 U.S.C. § 636(b)(1)(A)** |

### I.   INTRODUCTION

E. & J. Gallo Winery ("Plaintiff" or "E&J Gallo") filed a complaint for trademark infringement in this court on January 22, 2004. Doc. 1. After the summons and complaint were allegedly served upon Cantine Rallo ("Defendant") by service on January 28, 2004, on a designated representative under 15 U.S.C. § 1051(e), default was entered on March 19, 2004. *See* Doc. 6. The district court granted Plaintiff's proposed judgment of permanent injunction on March 24, 2004. Doc. 7. On July 12, 2004, Defendant moved to vacate the default judgment. *See* Docs. 8-11. Magistrate Judge Dennis L. Beck issued Findings and Recommendations ("F&R"), recommending that the motion to vacate be granted on the grounds that the judgment was void because service was improper. Magistrate Judge Beck rejected Defendant's alternative argument that default should be set aside for excusable neglect under Federal Rule of Civil Procedure 60(b)(1). *See* Doc. 36, filed Sept 22. 2004.

1

Plaintiff timely objected to the F&R and seeks review in the district court.  Doc. 36, filed Sept. 22, 2004.  Defendant opposes Plaintiff's objections, Doc. 39, filed Oct. 13, 2004, and moves for "conditional reconsideration" of the part of the F&R concerning Rule 60(b)(1), Doc. 34, filed Sept. 22, 2004.

## II.  **FACTUAL BACKGROUND**

Cantine Rallo has been producing Marsala wine since 1860 and has been selling wine in the United States for more than fifty years.  Doc. 11, Declaration of Francesco Vesco, at ¶1-2.  In 1962, Rallo obtained a trademark for the mark Rallo and associated design.  Doc. 39 at 1.

Rallo allowed its trademark to lapse, however, and again applied to register the mark in 2001.  *Id*.  Rallo engaged an Italian patent and trademark agent, Luciana Perrotta, to pursue the renewal of their trademark.  Doc. 31, Ex. A, Deposition of John Egbert, at 8.[1]  Perrotta, in turn, maintained a business relationship with John Egbert, a Houston attorney specializing in patent and trademark litigation.  Perrotta retained Egbert to help with the registration of the Rallo trademark.  *Id*. at 17.

Egbert, acting upon Perrotta's instructions, filed an application with the Patent and Trademark Office (PTO) to register the Rallo trademark.  *See Id*. at 34-35.  As part of the application process, in accordance with PTO regulations and

---

[1]    The copy of the transcript of this deposition submitted to the court bears two page numbering systems.  The citations contained in this memorandum opinion refer to the page numbers of the deposition

2

Egbert's regular practice, Egbert designated himself the "domestic representative" for service of process pursuant to 15 U.S.C. § 1051(e). *Id*. at 23-24. Egbert assumed the status of domestic representative in March 2001. *Id*. at 37. The PTO approved Rallo's application on December 30, 2002. *See* Doc. 39 at 1.

On October 29, 2003, E&J Gallo initiated a proceeding before the PTO to oppose Rallo's trademark application. Egbert Depo., at 39-40. E&J Gallo served the administrative opposition on Egbert. *Id*. Egbert, in turn, provided a copy of the relevant documents to Perrotta. *Id*. 40. Egbert asserts that, along with copies of the documents, it was his normal practice to send a communication to his client (in this case, Perrotta) indicating that an answer would be due in the near future. *Id*. at 40. With respect to these documents, and every other filing received by Egbert concerning the Rallo trademark, Egbert simply sent copies of documents and communications directly to Perrotta. Egbert had no way of knowing when, whether, or in what form those documents were passed along to Rallo. *Id*. 40. Perrotta then instructed Egbert to respond to E&J Gallo's administrative opposition. Egbert complied with this request. *Id*. at 43.

On January 23, 2004, Egbert received a letter from E&J Gallo warning Rallo of the strength of the E&J Gallo mark and demanding that Rallo cease and desist using the Rallo mark. *Id*. at 44. Again, Egbert asserts that his normal practice would have been to forward this letter directly to Perrotta.[2]

---

**2** Egbert does possess many transmittal letters notifying Perrotta that certain documents were received by his Houston

While the administrative opposition proceeding was pending, E&J Gallo filed this action ("the district court complaint").  In the district court complaint, E&J Gallo alleges, among other things, that Rallo's use of its trademark infringes upon trademarks belonging to E&J Gallo, in violation of federal statute and state law.  Doc. 1.  Egbert was served a copy of the district court complaint on January 28, 2004.  Egbert Depo., at 56.[3]  Although Egbert did not believe he was the proper person to be served with the district court complaint, he nevertheless forwarded it on to Perrotta.  *Id*. at 59.  Neither Perrotta nor Rallo ever advised Egbert to take any action with respect to the district court complaint.  On March 11, 2004, Egbert sent Perrotta an opinion letter concerning the possibility default judgment could be entered in the district court case.  *Id*. at 69.

Egbert then received from E&J Gallo a petition to suspend proceedings in the trademark application proceeding because of the pending district court case.  *Id*. at 69-70.  This was also forwarded to Perrotta.  *Id.* at 71.

On March 1, 2004, E&J Gallo served a second cease and desist letter addressed to Rallo upon Egbert.  This letter warned of E&G

office, but these transmittal letters were not disclosed in discovery because Egbert considered them to be privileged attorney-client communications.  Egbert established a privilege log for these letters, but the log has not been made part of the record.  Egbert Depo., at 47-48.

[3]   The summons served with the complaint bears the caption: "Central District of California."  However, the summons was signed by the clerk of court for the Eastern District of California.  The parties do not explicitly address the consequences of this technical error.

**4**

1   Gallo's intent to seek entry of default in the district court
2   case.  Doc. 18, Declaration of Matthew A. Berliner, Ex. D.
3   Egbert again sent this document to Perrotta.  However, Egbert
4   acknowledges that, at this time, his communications with Perrotta
5   were "very sketchy and distant and far between and
6   uninformative."  Egbert Depo., at 81.  Egbert speculates that
7   Rallo might have "severed their relationship with Perrotta during
8   this time."  Id.  This was only supposition, however, as Rallo
9   never gave Egbert any direct notification that Perrotta was no
10  longer representing Rallo.  Again, Rallo never sent Egbert any
11  instructions to take action with respect to the district court
12  case or the March 1 cease and desist letter.

13      On March 16, 2004, E&J requested entry of default and
14  default judgment.  Doc. 5.  The relevant documents were served
15  on Egbert, who transmitted them to Perrotta.  Egbert Depo., at
16  63.  Egbert never received a response from Perrotta, nor did he
17  ever have a conversation with Perrotta about the subject.

18      Default was entered on March 19, 2004, and default judgment
19  granted on March 24.  Docs. 6 & 7.  Egbert forwarded documents
20  reflecting these actions to Perrotta.  Egbert Depo., at 101-102.

21      Rallo acknowledges receipt of a copy of the Summons and
22  Complaint but claims that Egbert never informed it that this was
23  a separate proceeding that required a separate response.  Vesco
24  Decl., at ¶4-5.  Rallo claims to have first become aware of the
25  default judgment when one of its United States distributors,
26  Distillerie Stock, contacted Rallo and informed it of the
27  permanent injunction.  Id.

28      In early April 2004, Egbert received a copy of E&J Gallo's

**5**

motion for summary judgment in the administrative proceeding
before the PTO.  Egbert Depo. at 93-94.  Presumably, this motion
was based on the entry of default judgment and permanent
injunction in the district court case.  Egbert again sent these
documents to Perrotta, but received no response or instructions
regarding the administrative proceeding.  *Id*. at 95.

On April 19 2004, Sergio Ardito, who represented himself as
a translator for Rallo, contacted Egbert to inquire about finding
counsel to represent Rallo in the Eastern District of California.
*Id*. at 63.  Egbert sent a letter in response the same day,
suggesting two law firms in the Fresno area.  Egbert Depo., Ex.
B.

Rallo retained Jonathan Moskin of White & Case in New York
to represent it in the district court matter.  On July 1, 2004,
Moskin sent a letter to E&J Gallo acknowledging the entry of
judgment by default and seeking an informal resolution to the
matter (presumably in the form of a stipulation to set aside
default) "without the need for protracted proceedings."  Doc.
10., Declaration of Jonathan Moskin, Ex. E.  This request was,
obviously, not successful, and Rallo filed its motion to set
aside the default judgment on July 12, 2004.  Doc. 8.

Apparently, Rallo also failed to timely file a response to
E&J Gallo's motion for summary judgment in the administrative
proceeding, and the motion was granted without opposition.  On
July 16, 2004, Rallo moved the Trademark Trial and Appeal Board
("TTAB") for relief from this ruling.  Rallo submitted a copy of
the Magistrate Judges' F&R setting aside the default in the
district court case and urged the administrative tribunal to do

6

the same.  *See* Doc. 46.  E&J Gallo objected that the F&R was not
a final order and that the matter was still pending.  On December
27, 2004, the TTAB issued an order permitting Rallo to clarify
the status of the pending civil case.  Rallo failed to respond to
this order.  On March 17, 2005, the TTAB denied Rallo's motion
for relief from judgment.  E&J Gallo filed a copy of the TTAB's
decision with the district court on April 14, 2005,  Doc. 45, and
served a copy of such on Rallo's counsel, Doc. 46.  This was,
apparently, the first Rallo's counsel had heard of the TTAB's
December 27, 2004 order or of the denial of its motion for relief
from judgment.  *See* Doc. 52, filed Apr. 22, 2005.  Rallo promptly
moved to have its motion for relief from judgment reinstated on
the grounds that its failure to timely respond to the December
27, 2004 order was excusable neglect.  *Id.*  The record does not
reflect any further developments in the administrative case.

### III.  <u>THE MAGISTRATE'S FINDINGS AND RECOMMENDATIONS</u>

The F&R has two components.  Magistrate Judge Beck first
examined the effect of 15 U.S.C. § 1051(e), which provided at the
time of the attempted service in this case that any applicant for
a trademark "shall designate, by a document filed in the United
States Patent and Trademark Office, the name and address of a
person resident in the United States on whom may be served
notices or process in proceedings affecting the mark."  The F&R
concluded that § 1051(e) only applies to proceedings before the
Patent and Trademark Office and does not authorize service on a
designated domestic representative in proceedings in U.S.
district courts.  *Id*. at 8:3-5.  As a result, "[s]ervice of

**7**

1    process upon Mr. Egbert [allegedly designated as Defendant's
2    domestic representative under §1051(e)] was not proper under the
3    circumstances of this case, nor was Mr. Egbert properly
4    designated as Defendant's domestic representative." *Id*. at 9:23-
5    24.  The F&R concluded that default was not properly entered
6    (i.e., that it was void) and should be vacated.

7          The F&R next addressed the alternative argument that default
8    should be vacated based on Defendant's excusable neglect and
9    concluded that Defendant had not met its burden of proving
10   excusable neglect.  *Id*. at 12:8-9.

11         In moving for reconsideration of the Magistrate Judge's
12   findings and recommendations, E&J Gallo moves only for a
13   reconsideration of the first of these findings concerning section
14   1051(e) and reasserts its entitlement to recover attorneys fees
15   and costs.  *See* Doc. 36 at 1:6-12.  Rallo opposes reconsideration
16   of this finding.  *See* Doc. 39.  Rallo also filed a "conditional"[4]
17   objection to the second of the Magistrate Judge's findings and
18   recommendations:  that excusable neglect did not exist for
19   Defendant under Fed. R. Civ. P. 60(b)(1).  *See* Doc. 34.  E&J
20   Gallo opposes Rallo's conditional objections.  Doc. 38
21   //
22   //
23   //
24   //
25
26         [4]   As the first finding is sufficient to vacate the
27   default judgment entered against Defendant, Defendant only
     objects to the second finding if the Plaintiff's motion for
28   reconsideration of the first finding is granted.  *Id*.

# IV.   STANDARD OF REVIEW

When a party objects to the findings and recommendations of a magistrate judge, the district court shall review *de novo* the findings of fact and conclusions of law to which objection is made. 28 U.S.C. § 636(b)(1)(C); *Unites States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (*en banc*). The court need not review *de novo* any finding or recommendation that the parties accept as correct. *Id.* at 1121. The district court may accept, reject, or modify, in whole or in part, the magistrate judge's findings or recommendations. *See* 28 U.S.C. § 636(b)(1).

# V.   LEGAL ANALYSIS

## A.   Effectiveness of Service upon Mr. Egbert.

Plaintiff moves for reconsideration of that portion of the F&R interpreting 15 U.S.C. 1051(e). Doc. 36 at 1:6-12. In 2001, when Egbert filed Rallo's trademark application, section 1051(e) provided in pertinent part that a foreign trademark applicant:

> shall designate, by a document filed in the United States Patent and Trademark Office, the name and address of a person resident in the United States on whom may be served notices or process in proceedings affecting the mark.[5]

---

[5]   The statute has since been amended to make the designation of a domestic representative optional, rather than mandatory. The current statutory text provides:

> If the applicant is not domiciled in the United States the applicant may designate, by a document filed in the United States Patent and Trademark Office, the name and address of a person resident in the United States on whom may be served notices or process in proceedings affecting the mark. Such notices or process may be served upon the person so designated by leaving with that person or mailing to that person a copy thereof at

**9**

Plaintiff attempted to serve its civil complaint against Defendant for alleged "trademark infringement and dilution" on Mr. Egbert, the Texas lawyer.  Two issues are presented: (1) whether a person appointed by a foreign corporation under § 1051(e) may accept service of process for any civil proceeding or only for proceedings before the PTO; and (2) whether Mr. Egbert was a properly designated representative under § 1051(e).

**1.   Does 1051(e) permit service of process upon a "domestic representative" in a federal civil action?**

Whether section 1051(e) allows service on a domestic representative of a foreign corporation in a civil action is a question of first impression in this Circuit.[6]  Of the district courts that have considered the subject, two have found that section 1051(e) provides for service in all civil actions, *see V&S Vin and Sprit Aktiebolag v. Cracovia Brands, Inc.*, 212 F.

---

the address specified in the last designation so filed. If the person so designated cannot be found at the address given in the last designation, or if the registrant does not designate by a document filed in the United States Patent and Trademark Office the name and address of a person resident in the United States on whom may be served notices or process in proceedings affecting the mark, such notices or process may be served on the Director.

15 U.S.C. § 1051(e), as amended by the Technical Corrections in Trademark Law, Pub. L. No. 107-273 § 13207 (2002) (emphasis added).

[6]   The Magistrate Judge correctly noted that "[f]ew courts have examined whether section 1051(e) provides for service on a domestic representative in civil actions brought against foreign corporations, and []the courts that have analyzed the issue [] are inconsistent.  No court in the Ninth Circuit has tackled the issue."  F&R at 5:24-27.

Supp. 2d 852 (N.D. Ill. 2002); *Haemoscope Corp. v. Pentapharm AG*, 2002 WL 31749195 (N.D. Ill. Dec. 9, 2002); *see also Havana Club Holding, S.A. v. Galleon S.A.*, 974 F. Supp. 302, 311-12 (S.D.N.Y. 1997) (finding in dicta that, where there has been an appointment of a domestic representative, section 1051(e) affords service in civil court proceedings affecting the trademark), while two district courts have found that the statute does not apply to service in a civil suit, *see Outboard Marine Corp. v. Chantiers Beneteau*, 687 F. Supp. 366 (N.D. Ill. 1988); *Sunshine Distribution, Inc. v. Sports Authority Michigan, Inc.*, 157 F. Supp. 2d 779, 787 (E.D. Mich. 2001).[7]

---

[7]     A number of other courts have examined the related question of whether the Lanham Act addresses a federal court's ability to assert personal jurisdiction over a Lanham Act defendant.  Under the "national contacts" doctrine, where a federal statute authorizes nationwide service of process, the due process requirements of the Fifth Amendment are satisfied for the purposes of personal jurisdiction where defendant has sufficient contacts with the nation as a whole, rather than sufficient contacts with the particular state in which the federal court sits.  Many courts have held that the Lanham Act contains no such provision. *See Wells Fargo & Co. v. Wells Fargo Exp. Co.*, 556 F.2d 406, 418 (9th Cir. 1977)("[N]ot all federal statutes which grant a federal right to recovery and provide for suit in federal court contain an additional provision granting [nationwide] service of process powers.  The Lanham Act, presently before us, apparently does not."); *see also Sports Auth. Mich., Inc. v. Justballs*, Inc., 97 F. Supp. 2d 806, 809 (E. D. Mich. 2000) ("The Lanham Act does not...provide for nationwide service of process on a defendant or otherwise address this Court's personal jurisdiction over Lanham Act defendants."); *Search Force, Inc. v. Dataforce Intern., Inc.*, 112 F. Supp. 2d 771, 775 (S.D. Ind. 2000)(holding that Lanham act does not provide for nationwide service of process); *Johnson Worldwide Assoc., Inc. v. Brunton Co.*, 12 F. Supp. 2d 901, 906 (E.D. Wis. 1998)(same).  *But see Havana Club Holding, S.A. v. Galleon S.A.*, 974 F. Supp. 302 (S.D.N.Y. 1997)(holding that section 1051(e)'s requirement for designation of an agent for service of process renders foreign registrants "subject to the jurisdiction of the United States"

a.   **The Plain Language of the Statute**.

At the center of this dispute is the statutory language. In 2001, when Mr. Egbert applied to renew Rallo's trademark and designated himself as Rallo's domestic representative, the statute provided:

> If the applicant is not domiciled in the United States he shall designate by a written document filed in the Patent and Trademark Office the name and address of some person resident in the United States on whom may be served notices or *process **in proceedings affecting the mark.*** Such notices or process may be served upon the person so designated by leaving with him or mailing to him a copy thereof at the address specified in the last designation so filed. If the person so designated cannot be found at the address given in the last designation, such notice or process may be served upon the Director.

15 U.S.C. § 1051(e) (emphasis added).   The critical language is the phrase "proceedings affecting the mark."   The parties in this case, and other district courts, disagree as to the scope and meaning of this phrase.   Defendant maintains that this language refers only to matters before the Patent and Trademark Office "affecting the mark."   Plaintiff contends it extends to any claim "affecting the mark," including claims brought in federal district court.

This is a question of statutory construction:

> The purpose of statutory construction is to discern the intent of Congress in enacting a particular statute. The first step in ascertaining congressional intent is

for purposes of a jurisdictional pre-requisite contained within the Cuban Assets Control Regulations, 31 C.F.R. § 515.201(b)(1)).
    In any case, the effect of the Lanham Act's terms on the exercise of personal jurisdiction is not germane to the question at issue in this case -- whether 1051(e) authorizes <u>service</u> upon the designated agent in a case brought in federal court.

> to look to the plain language of the statute. To determine the plain meaning of a particular statutory provision, and thus congressional intent, the court looks to the entire statutory scheme. If the statute uses a term which it does not define, the court gives that term its ordinary meaning.
>
> The plain meaning of the statute controls, and courts will look no further, unless its application leads to unreasonable or impracticable results. If the statute is ambiguous--and only then--courts may look to its legislative history for evidence of congressional intent.

*United States v. Daas*, 198 F.3d 1167, 1174 (9th Cir. 1999).

A statute is ambiguous if it "gives rise to more than one reasonable interpretation." *DeGeorge v. United States Dist. Court for the Cent. Dist. of Cal.*, 219 F.3d 930, 941 (9th Cir. 2000); *see also U.S. v. Ventre*, 338 F.3d 1047, 1052 (9th Cir. 2003)("[W]here a statute yields to more than one reasonable interpretation, we turn to the statute's legislative history for evidence of congressional intent.").

Here, Plaintiff first asserts that the term "proceeding" is unambiguous, pointing to the Black's Law Dictionary definition of the term "proceeding":

> In the general sense, [a proceeding is] the form and manner of conducting juridical business before a court or judicial officer...[the term] also refers to administrative proceedings before agencies, tribunals, bureaus, or the like.

Black's Law Dictionary, p. 836 (6th ed. 1991).  But in the statute, the term "proceedings" is modified by the phrase "affecting the mark."  Plaintiff's reliance on the dictionary definition of the term "proceeding" does not settle whether the phrase "proceedings affecting the mark" is susceptible to more than one reasonable interpretation.

Plaintiff also points out that § 1051(e) refers to "***notice***

**13**

1   *or service* in proceedings affecting the mark."  Plaintiff

2   asserts that the term service is an unambiguous reference to

3   service of process in a civil case.  First, Plaintiff insists

4   that the term "service of process" has a well-established

5   technical meaning: "a formal delivery of documents that is

6   legally sufficient to charge the defendant with notice of the

7   pending action."  *Volkswagenwerk A.G. v. Schlunk*, 486 U.S. 694,

8   700 (1988).  Plaintiff also notes that an administrative

9   opposition filed in a PTO proceeding is called a "notice of

10  opposition," implying that the term "service" could not refer to

11  documents in a PTO proceeding and therefore must refer only to

12  documents in a civil proceeding.  This is a plausible reading,

13  but is not the only reasonable interpretation.

14      Defendant submits that the statutory language is equally

15  susceptible to an interpretation that would preclude service in a

16  civil action upon a domestic representative.  Rallo relies

17  heavily on the location of the disputed language in the overall

18  statutory scheme.  Section 1051(e) is part of Section 1 of the

19  Lanham Act, which generally sets forth the process by which a

20  trademark application must be filed with the PTO and makes no

21  mention of causes of action in the federal courts.  Other

22  subsections explain how to file and amend use-based and intent-

23  to-use applications, §§ 1051(a)-(c), and how to verify "use,"

24  § 1051(d).  The district court in *V&S Vin* found location to be an

25  indicator of ambiguity:

26          [T]he fact that the provision for designating a
            resident for service of process appears in the
27          section of the trademark law regarding
            registrations suggests that Congress may have
28          intended the appointment to cover only those

**14**

> proceedings concerning the registration of the
> mark. This, in turn, gives rise to an ambiguity
> in the meaning of the statute, so we look to the
> legislative history for guidance.

*V&S Vin*, 212 F. Supp. 2d at 854.[8]  This reasoning is persuasive.

The statutory language is reasonably susceptible to either of the

interpretations advanced by the parties.  Accordingly, it is

appropriate to look beyond the plain meaning of the statute to

other indicators of Congressional intent, including legislative

history.

### b.   **A Review of the Caselaw**.

Of the four cases that have examined the specific issue

presented in this case, two engaged in some analysis of the

legislative history of the statute, but reached different

conclusions.  At the heart of the conflict are two paragraphs of

testimony given in 1925 by Arthur W. Barber, a U.S. Trademark

Association official, before the Congressional Joint Committees

on Patents.  Mr. Barber stated in his testimony:

> Section 8 provides that the foreign applicant for a
> trade-mark shall name a representative in this country
> upon whom may be served process...in any action or
> proceeding affecting his trademark brought under the
> provisions of this act, or under the provisions of any
> other laws of the United States.

> It seems to me, Mr. Chairman, that the process that it
> is permitted to serve upon a representative so named
> should be limited to the process in a proceeding
> affecting the registration it should not be extended so
> as to enable a party to get jurisdiction of a foreign
> registrant in an action not confined – or a proceeding
> not confined to his registration.  It seems to me that

---

[8]    *V&S Vin* is internally inconsistent on the question of
ambiguity.  The opinion later states:  "This Court does not agree
that the term 'proceeding,' standing alone, is sufficiently
ambiguous to require an analysis of its legislative history.  212
F. Supp. 2d at 855.

> in a common law action for an injunction under this provision of the bill, process should be served upon the representative named in the registration, and *it strikes me that this is altogether too broad a provision*.

Hearings on S. 2679 Before the Joint Comm. on Patents, 68th Cong., 2d Sess 133 (1925)(emphasis added).

The district court in *Outboard Marine* concluded that Congress had adopted Barber's recommendation that broad language inviting service upon the designated representative was limited to "proceedings affecting the trademark brought...under the provisions of any other law of the United States" was "altogether too broad a provision."   *Outboard Marine* emphasized the omission of the term "action" from the current statutory text:

> [The precursor to Section 1051(e)], as enacted, makes no mention of the term "action." It is therefore reasonable to infer that this term was elided from the section in order to limit the service provision to proceedings in the PTO.

687 F. Supp. at 368.

By contrast, the district court in *V&S Vin* gave little weight to the Barber testimony.  He was not a legislator.  Less weight is afforded individual hearsay statements about legislation than to legislative committee notes or code commissioner's notes.  *V&S Vin*, 212 F. Supp. 2d at 855 (citing *Kelly v. Robinson*, 479 U.S. 36, 51 n.13 (1986)).  The *V&S Vin* court reasoned that *Outboard Marine* had relied on an erroneous analysis of legislative history:

> ...Congress did not actually make a decision to omit the word "action" from the service of process provision; in fact, that word never appeared in any version of the bill. Moreover, the legislative history indicates that Congress did not intend for the § 1051(e) agent to receive service of process only in proceedings affecting

the registration of the mark notwithstanding the provision's placement in the part of the trademark statute that concerns registration. Early versions of the bill contained that exact language, but as enacted, the provision covers all "proceedings affecting the mark." *See* S. 2679; H.R. 6248; H.R. 13486; H.R. 6683....

212 F. Supp. 2d at 855-56.

As explained below, a comprehensive review of the legislative history does precious little to un-muddy the waters (or the wine).

### c. <u>Legislative History: A Review of Congressional Action Leading up to the Passage of the Lanham Act</u>.

The first draft of the bill that would eventually become the Lanham Act was submitted for consideration by the Senate on February 29, 1924. Section 8 of this bill provided:

Every applicant for registration of a trade-mark, or for renewal of registration of a trade-mark, who is not resident within the United States, shall...designate...some person residing within the united states ***on whom process or notice of proceedings affecting the trade-mark of which such applicant may claim to be the owner, brought under the provisions of this Act or under other laws of the united States***, may be served with the same force and effect as if served upon the applicant or registrant in person...

S. 2679, 68th Cong. § 8 at 10 (1st Sess. 1924).

Shortly after the submission of this draft bill, the Joint Committee on Patents held a hearing on S. 2679, during which Mr. Barber made the statements cited in *Outboard Marine* and *V&S Vin.* His complete statement reads as follows:

**Mr. Barber**: Section 8 provides that the foreign applicant for a trade-mark shall name a representative in this country upon whom may be served process in any action or proceeding - that is lines 12 and 13 of page 10- in any action or proceeding affecting his trademark brought under the provisions of this act, or under the

17

provisions of any other laws of the United States.

It seems to me, Mr. Chairman, that the process that it is permitted to serve upon a representative so named should be limited to the process in a proceeding affecting the registration it should not be extended so as to enable a party to get jurisdiction of a foreign registrant in an action not confined – or a proceeding not confined to his registration.  It seems to me that in a common law action for an injunction under this provision of the bill, process should be served upon the representative named in the registration, *and it strikes me that this is altogether too broad a provision*.

Hearings on S. 2679 Before the Joint Comms. on Patents, 68th Cong. at 133 (2d Sess. 1925).

Mr. Barber's comments arguably influenced an edit made to the text of the next draft bill submitted to the House:

Every applicant for registration of a trade-mark or for renewal of registration of a trade-mark, who is not resident within the united States, shall...designate...some person residing within the United States on whom *process or notice of proceedings affecting the registration* of the trade-mark of which such applicant may claim to be the owner, *brought under the provision of this Act or under other laws of the United States*, may be served, with the same force and effect as if served upon the applicant or registrant in person....

H.R. 6248, 69th Cong. § 8 at 11-12 (1st Sess. 1925)(emphasis indicating changed language).  The use of the phrase "proceedings affecting registration" is more narrowly drawn than the phrase "proceedings affecting the mark."  However, the text still included the language "brought under the provision of this Act or under other laws of the United States," which is arguably broad enough to encompass civil complaints filed in federal district court for injunctive relief.

This language remained unchanged in two draft bills submitted to the House in 1926 and 1927, respectively.  H.R.

**18**

13486, 69th Cong. § 8 at 11-12 (2d Sess. 1926); H.R. 6683, 70th Cong. § 8 at 16 (1st Sess. 1927).  In March 1928, language was inserted requiring that the designation be "continuously maintained":

> Every applicant for registration of a trade-mark or for renewal of registration of a trade-mark, who is not resident within the united States, shall...designate... some person residing within the United States on whom process or notice of proceedings affecting the registration of the trade-mark of which such applicant may claim to be the owner, brought under the provision of this Act or under other laws of the United states, may be served, with the same force and effect as if served upon the applicant or registrant in person. ***Such designation shall be continuously maintained.***

H.R. 11988, 70th Cong. § 8 at 17-18 (1st Sess. 1928)(emphasis indicating changed language).  This text remained unchanged throughout 1928 and 1929.  H.R. 13109, 70th Cong. § 8 at 15-16 (1st Sess. 1928); H.R. 2828, 71st Cong § 8 at 14-15 (1st Sess. 1929).

After the 1929 draft, the bill was tabled for almost ten years.  In January 1938, Congress again turned its attention to trademark legislation.  A draft that more closely resembles the modern statutory language was then introduced to the House:

> **Title I** - The Principal Register
>
> **Sec. 2.** Trade-marks used in commerce shall be registered in the following manner:
>
> (a)  By filing in the Patent Office –
>
>> (1)  a written application, verified by the applicant, in such form as may be prescribed by the Commissioner;
>> (2)  a drawing of the trade-mark; and
>> (3)  number of specimens or facsimiles of the trade-mark as actually used as may be required by the Commissioner.
>
> (b)  By paying into the Patent Office the sum of $15.

    (c)  By complying with such rules or regulations, not inconsistent with law, as may be prescribed by the Commissioner.

    (d)  ***If the applicant is not domiciled in the United States he shall designate by a written document filed in the Patent Office some person resident in the United States on whom may be served notices or process in proceedings affecting the trade-mark.***

H.R. 9041, 75th Cong. § 2(d) at 2 (3d Sess. 1938))(emphasis indicating changed language).  Noticeably absent is the broad language "brought under the provision of this Act or under other laws of the United states" found in all of the drafts considered during the 1920s.  However, the text shifted back to "proceedings affecting the trade-mark" rather than the narrower "proceedings affecting the registration."

This language evolved over the next few years toward the current statutory text.  In March of 1938, the House considered a bill which specified that service could be made by leaving a copy of relevant documents at the designee's last known address:

If the applicant is not domiciled in the United States he shall designate by a written document filed in the Patent Office some person resident in the United States on whom may be served notices or process in proceedings affecting the trade-mark. ***Such notices or process may be served upon the person so designated by leaving a copy thereof at the last address so filed.***

H.R. 4744, 76th Cong § 2(d) at 2 (1st Sess. 1938)(emphasis indicating new language).[9]

In 1939, the Trademarks Subcommittee of the House Committee on Patents held hearings on H.R. 4744.  The service/designation provision was discussed at some length during the testimony of Karl Fenning, a PTO official.

---

[9]    Later amendments to this statute moved the disputed provision to § 1051(e).

**Mr. Fenning**: This provides, theoretically, for the appointment of an agent in the United States, on whom service may be made. It frequently happens that the agent thus appointed dies or disappears during the 20-year period of registration. In some instances that may not be of very great moment, but in other instances it may be of very great moment. It seems to me there should be a provision made in here for a continuous appointee's name and address appearing on the record, possibility with a further provision that on the failure to locate the agent, service may be made on the Commissioner of Patents, and ***jurisdiction may be obtained in the courts of the District of Columbia***. You see, without any agent present, if the agent dies or disappears, the court has no jurisdiction of proceedings to cancel the mark. I think some provision of that sort should be made to cover those eventualities.

**[Congressman] Lanham**: Personally, I see no objection to that, because, in order that process may be made or served there must be someone on whom it can be served.

Hearings on H.R. 4744 Before the Subcommittee on Trademarks of the House Committee on Patents, 76th Cong. at 14-15 (1st Sess. 1939).[10]

One commentator asserts that the above-quoted testimony makes it "clear that the drafters of the Lanham Act expressly intended section 1(e) to pertain to service of process in a civil court proceeding." *See* Keith M. Stolte, *Avoiding Hague*

---

[10] In support of this second point, Stolte quotes *Havana Club Holding, S.A. v. Galleon, S.A.,* 974 F. Supp. 302, 311 (S.D.N.Y. 1997), which held that designation of an agent by a foreign corporation pursuant to section 1051(e) satisfied the requirement in an unrelated statute that the corporation be "subject to the jurisdiction of the United States." The *Havana Club* court also stated in dicta that a foreign company was "subject to service of process by service of its United States representative" designated pursuant to 1051(e). *Id*. Critically, the scope and meaning of 1051(e) was not in dispute in the *Havana Club* case, nor did the *Havana Club* court engage in any detailed analysis of the provision.

21

*Convention Headaches--An analysis of Lanham Act Section 1(e)*
*Service of Process on Foreign Nationals*, 92 Trademark Rep. 1417,
1424-25 (2002).  Stolte further asserts that the mention of
obtaining jurisdiction in the courts of the District of Columbia
"implies that [section 1051(e)] may also provide a valid basis to
confer personal jurisdiction as well as to permit service of
process on a foreign national in civil litigation."  *Id.* at n.35.
But the statement by Mr. Fenning is hardly "clear" evidence of a
legislative intent to make section 1051(e) apply to service of
process in district court cases.  No language establishing
jurisdiction in the district court of the District of Columbia
over 1051(e) proceedings was ever inserted into any subsequent
version of the Lanham Act.

Later during that same hearing on H.R. 4744, Mr. Fenning and
Congressman Lanham discussed over the manner by which documents
may be served upon designated agent.  Mr. Fenning argued:

> It says notice or process may be served, in effect, by
> leaving a copy at the address specified in the last
> designation.  I do not think that is adequate service
> on anything or anybody.  I would suggest that that be
> amended to say that notice or process may be served in
> the manner provided by the Rules of Civil Procedure.
> This bill [as currently drafted] merely means you can
> go along and slip something in the window or put it in
> the ash-can in the back yard.

Hearings on H.R. 4744, at 89 (1939).  Specific methods of service
were discussed, but the language remained essentially unchanged:

> **[Congressman] Lanham:** [Reading proposed language] Such
> notices or process may be served upon the person so
> designated by leaving him a copy thereof at the address
> specified in the last designation so filed.
>
> **Mr. Fenning:** The rules of procedure have worked out
> every detail; that is why I think we ought to refer to
> them.

22

> **[Congressman] Lanham:** [The language as proposed] does not obviate them.
>
> **Mr. Fenning:** Those rules have no effect here unless we put it in the statute that they do.

*Id.* at 92.  If Fenning believed that 1051(e) covered service in all district court cases, his comment would make no sense at all, as the Federal Rules of Civil Procedure already governed service throughout the federal court system.  Rather, Mr. Fenning states his view that the intent of 1051(e) was to set up a parallel system of service for administrative proceedings.

A provision for alternative service upon the Commissioner was proposed in June of 1939 and considered by both the House and Senate.

> If the applicant is not domiciled in the United States he shall designate by a written document filed in the Patent Office some person resident in the United States on whom may be served notices or process in proceedings affecting the trade-mark. Such notices or process may be served upon the person so designated by leaving a copy thereof at the last address so filed. ***If the person so designated cannot be found at the address given in the designation, such notice or process may be served upon the Commissioner.***

S. 895, H.R. 6618, 76th Cong. § 2(d) at 2 (1st Sess. 1939)(emphasis indicating changed language).

This language remained unchanged in drafts submitted to the House in 1941, 1943, and 1945.  H.R. 5461, 77th Cong. § 2(d) at 3 (1st Sess. 1941); H.R. 82, 78th Cong. § 2(d) at 3 (1st Sess. 1943); H.R. 1654, 79th Cong. § 2(d) at 3 (1st Sess. 1945).

No further changes were made to this provision prior to the enactment of the Lanham Act in 1946.  60 Stat. 427 (July 5, 1946).

23

In 2002, the designation of a domestic agent for service was made voluntary and provision was made for situations in which no designation is made:

> If the applicant is not domiciled in the United States the applicant **may designate,** by a document filed in the United States Patent and Trademark Office, the name and address of a person resident in the United States on whom may be served notices or process in proceedings affecting the mark. Such notices or process may be served upon the person so designated by leaving with that person or mailing to that person a copy thereof at the address specified in the last designation so filed. If the person so designated cannot be found at the address given in the last designation, **or if the registrant does not designate** by a document filed in the United States Patent and Trademark Office the name and address of a person resident in the United States on whom may be served notices or process in proceedings affecting the mark, such notices or process may be served on the Director.

Technical Corrections in Trademark Law, Pub. L. No. 107-273 § 13207 (2002).  (This bill caused language of § 1051(e) to conform to the voluntary provision in the Patent Act, which will be discussed in greater detail below.)

Discerning Congressional intent from this legislative history is extremely difficult.  Ordinarily, the hearsay comments from individuals, even if they are legislators, are not authoritative as compared with committee reports.  *Hertzberg v. Dignity Partners, Inc.*, 191 F.3d 1076, 1082 (9th Cir. 1999); *see also Garcia v. United States*, 469 U.S. 70, 76 (1984).  Mr. Barber's comments, on which the *Outboard Marine* court relies, suggest only that one administrative official, who was not a legislator, believed the originally proposed service provision was too broad.  The drafts immediately succeeding his comments did change the language from "proceedings affecting the mark" to "proceedings affecting the registration" but this change is

**24**

nowhere explained in the Congressional Record.  The provision
continued to include the language:  "brought under the provision
of this Act or under other laws of the United States."  Given the
continued inclusion of this broad language, it is difficult to
conclude that Congressional intent was shaped in any way by
Barber's comments.  It is also hard to distinguish "proceedings
affecting the mark" which more readily admits of judicial actions
over the mark, from "proceedings affecting the registration"
which more narrowly addresses the administrative process to
perfect the mark before the PTO and potential judicial litigation
concerning the registration.

     After a lengthy break in legislative activity on the subject
lasting throughout most of the 1930s, a new draft trademark law
was submitted in 1939 which reverted to the phrase "proceedings
affecting the mark."  It is impossible to tell whether this
reversion was an overt rejection of the "proceedings affecting
the registration" language; an attempt to acknowledge the
previous language "brought under the provision of this Act or
under other laws of the United states"; an inadvertent reference
to the language used in the earliest drafts by a drafter
unfamiliar with the many edits made to the text during the 1920s;
or the result of some other motivations or circumstances.[11]

--------

[11]    The Supreme Court cautions against drawing inferences
from failed legislative proposals, deeming them "a particularly
dangerous ground on which to rest an interpretation of a prior
statute."  *Central Bank of Denver, N.A. v. First Interstate Bank
of Denver, N.A.*, 511 U.S. 164, 187 (1994)("Congressional inaction
lacks persuasive significance because several equally tenable
inferences may be drawn from such inaction, including the
inference that the existing legislation already incorporated the

The testimony provided by Karl Fenning to the House Trademarks Subcommittee adds another facet to the analysis. Fenning suggested a provision for alternative service upon the Commissioner be included.  Language to that effect was added in June of that year.  On the one hand, Fenning made reference in his comments to ensuring default "jurisdiction in the courts of the District of Columbia."  This reference could imply that that Fenning believed that the term "proceedings affecting the mark" language was already broad enough to cover service in district court cases, and that it was preferable to provide a default venue in which jurisdiction would be assured, should the pre-designated domestic representative (within the jurisdiction of a particular district court) die or disappear.  However, no such language referencing the federal courts was ever included in § 1051.  Moreover, Fenning's simultaneous comment that the Federal Rules of Civil Procedure would "have no effect here unless we put it in the statute that they do" suggests that 1051(e) was not meant to cover proceedings in the district courts, as service of process in such proceedings was governed by the Federal Rules.

At best, the legislative history suggests a narrow interpretation.  But, given the scepticism with which courts are instructed to view opinions of individual witnesses and legislators that are not reflected in the statutory language or in committee reports, serious ambiguity remains.

---

offered change."); *see also Solid Waste Agency of Northern Cook County v. United States Army Corps of Eng'rs*., 531 U.S. 159, 160 (2001).  Even if it were possible to glean Congressional intent from the pre-1938 drafts, these were essentially abandoned and could be considered "failed legislative proposals."

d.   **Other Indications of Legislative Intent.**

(1)   **PTO Policy as set forth in TMEP § 604.**

E&J Gallo argues that Rallo's interpretation of § 1051 conflicts with established policy of the PTO. E&J Gallo points to section 1008 of the "Trademark Manual of Examining Procedure" ("TMEP"), which provides:

> The designation [of a representative] is not the same as a power of attorney. The designation serves a different purpose, namely, ***to bring foreign applicants, registrants and parties under the jurisdiction of the United States legal system.*** The designation of a domestic representative does not authorize the person designated to prosecute the application or to represent a party in a proceeding before the USPTO. 37 C.F.R. § 2.24. Similarly, a power of attorney does not serve as a designation of a domestic representative unless the power of attorney specifically states that the attorney is also the domestic representative on whom may be served notices or process in proceedings affecting the mark.

TMEP § 604, at "http://www.uspto.gov/web/offices/tac/tmep" (last visited Aug. 16, 2005) (emphasis added). This passage, E&J Gallo asserts, suggests that the PTO takes a broad view of the scope of a designation under 1051(e).

An agency's interpretation is entitled to deference under certain circumstances, such as when an agency is charged with the duty of interpreting and enforcing a regulation. Here, however, the target of the interpretation is a service-of-process provision, which is traditionally the province of the courts and not within the agency's special expertise. *See Ardestani v. INS*, 502 U.S. 129, 112, S.Ct. 515, 526 (1991)("[R]eviewing courts do not owe deference to an agency's interpretation of statutes outside its particular expertise and special charge to administer."). In addition, the above-quoted passage is from a

27

manual of trademark examining procedure, not a published rule

subject to notice and comment.  As such, it is entitled to even

less deference.  *Christensen v. Harris County,* 529 U.S. 576, 587,

(2000)("[I]nterpretations contained in policy statements, agency

manuals, and enforcement guidelines, all of which lack the force

of law--do not warrant Chevron-style deference....[but instead]

are entitled to respect....but only to the extent that those

interpretations have the power to persuade....").

### (2)   Meaning Ascribed to Similar Language in the Patent Act.

Finally, the choice of Congress to subject foreign

applicants, registrants, and parties to personal jurisdiction,

which is a waivable due process right, is distinguishable from

service of process to affect fair notice of the right to be heard

and defend, which is an unwaivable, if not consented to, due

process right.  Similar language contained within a section of

the U.S. Patent Act is of limited guidance.  35 U.S.C. § 293

provides:

> Every patentee not residing in the United States may
> file in the Patent and Trademark Office a written
> designation stating the name and address of a person
> residing within the United States on whom may be ***served
> process or notice of proceedings affecting the patent
> or rights thereunder***. If the person designated cannot
> be found at the address given in the last designation,
> or if no person has been designated, ***the United States
> District Court for the District of Columbia shall have
> jurisdiction*** and summons shall be served by publication
> or otherwise as the court directs. The court shall have
> the same jurisdiction to take any action respecting the
> patent or rights thereunder that it would have if the
> patentee were personally within the jurisdiction of the
> court.

(emphasis added).  This section uses the phrase "process or

notice of proceedings affecting the patent or rights thereunder"

alongside express language granting default personal jurisdiction over the foreign patentee to the federal courts of the District of Columbia if the designee cannot be found or no designee has been appointed.

The direct reference to the courts of the District of Columbia suggests that the Patent Act ascribes a meaning to the phrase "proceedings affecting the patent or rights thereunder" that includes claims brought in federal court.   On the one hand, the similar phrase "proceedings affecting the trademark" in the Lanham act could be assigned a similar meaning -- one that encompasses district court cases.  *See U.S. Industries, Inc. v. Maclaren, et al.,* 1976 WL 21010, 191 U.S.P.Q. 498 (D.D.C.) (finding that foreign patent owners become amenable to service in the United states by designating an agent for service of process under § 293).   The absence of any reference to the federal courts in § 1051(e) just as easily supports the opposite conclusion.

**(3)   Related language in other laws.**

Congress has clearly specified the scope of a designation to include service of process in district court cases.   Section 293 of the Patent Act is one example, which makes direct reference to federal court jurisdiction and grants personal jurisdiction over a foreign patentee.   There are many other federal provisions requiring the designation of an agent for service of process that expressly extend the scope of that designation beyond administrative proceedings.  *See e.g.*, 21 U.S.C. § 360mm ("It shall be the duty of every manufacturer offering an electronic product for importation into the United States to designate in writing an agent upon whom service of all ***administrative and***

29

*judicial* processes, notices, orders, decisions, and requirements may be made for and on behalf of such manufacturer...”);  49 U.S.C. § 30164 (“A manufacturer offering a motor vehicle or motor vehicle equipment for import shall designate an agent on whom service of notices and process in *administrative and judicial* proceedings may be made.”).  Other federal statutes employ broad language implying that the designation applies to service of process in a wide range of proceedings. *See e.g.*, 12 U.S.C. § 1819 (“The Board of Directors [of the Federal Deposit Insurance Corporation] shall designate agents upon whom service of process may be made *in any State, territory, or jurisdiction* in which any insured depository institution is located.”);  12 U.S.C. § 2277a-7 (“The Board of Directors [of the Farm System Insurance Corporation] shall designate an agent on whom service of process may be made *in any State or jurisdiction* in which any insured System bank is located.”)  Still other statutes set forth separate provisions, one requiring designation of an agent for service in administrative proceedings, another requiring a similar designation for service in district court proceedings. *See, e.g.*, 49 U.S.C. § 723 (“A carrier providing transportation subject to the jurisdiction of the [Surface Transportation] Board under subtitle IV shall designate an agent in the District of Columbia, on whom service of notices *in a proceeding before*, and of actions of, *the [Surface Transportation] Board* may be made.” );  49 U.S.C. § 724(a) (“A carrier providing transportation subject to the jurisdiction of the [Surface Transportation] Board under subtitle IV shall designate an agent in the District of Columbia on whom service of process *in an action before a*

30

*district court* may be made.").

e.   **Conclusion Re: the Scope of Section 1051(e).**

Whether section 1051(e) is intended to be limit service of process to administrative actions before the Patent and Trademark Office or extends to service of process in the federal courts as well is not answered by the ambiguous text of the statute.   The legislative history fails to clarify the meaning of the phrase "proceedings affecting the mark."[12]   In the final analysis, an examination of similar provisions in other federal laws provides meaningful guidance.   Congress knows how to provide for service of process in cases before the federal courts when it so intends. It has not done so here.   The Magistrate Judge correctly concluded that service upon an agent designated to accept service under section 1051(e) does not constitute valid service of process for purposes of this litigation in federal district court.   Service is therefore defective (void).   Defendant's motion to vacate the default judgment must be **GRANTED.**

2.   **The Effect of Mr. Egbert's Self-Designation**

The Magistrate Judge concluded that Mr. Egbert was not properly designated as a domestic representative of Rallo.   F&R at 8:3-25.   The F&R relied upon language found in the Trademark Manual of Examining Procedure ("TMEP"), which provides:

---

[12]   This issue was far from clear or settled at the time E&J Gallo served the relevant documents upon Mr. Egbert. Plaintiff could easily have effectuated service on Rallo in the manner provided by the Federal Rules of Civil Procedure.

1

2

> Designation of Domestic Representatives by Parties Not
> Domiciled in the United States.

3

> \*\*\*

4

> A person who is properly authorized to sign a
> designation of domestic representative is:

5

6

> (1)   A person with legal authority to bind the
>        applicant or party; or

7

8

> (2)   A person with firsthand knowledge of the
>        facts and actual or implied authority to act
>        on behalf of the applicant or party; or

9

10

> (3)   An attorney as defined in 37 C.F.R. § 10.1(c)
>        who has an actual written or verbal power of
>        attorney or an implied power of attorney from
>        the applicant or party.

11

TMEP § 604.  The F&R concluded that Mr. Egbert did not satisfy

12

any of the three categories of authorized persons who may execute

13

and file a domestic representative form.  The Magistrate Judge

14

reasoned:

15

16

> When [Egbert] receives instructions to file an
> application, he routinely designates himself as the
> domestic representative pursuant to 15 U.S.C. § 1051(e)
> without necessarily having the consent or instructions
> to do so from either the applicant or the agent.  He
> states that he "assumed" domestic representation status
> in March 2001.  Indeed Defendant's trademark
> application, signed only by Mr. Egbert, appoints Mr.
> Egbert as its attorney to prosecute the application and
> as domestic representative.

17

18

19

20

21

> According to Mr. Egbert's deposition and the trademark
> application, it appears that Defendant never actually
> contemplated Mr. Egbert's appointment as domestic
> representative.  Instead, Mr. Egbert's appointed
> himself by signing the trademark application following
> his usual method of conducting business.  This
> circumstance when viewed in light of § 1051(e)'s
> *optional nature* (i.e., that an applicant not domiciled
> in the United States "may" appoint a domestic
> representative), leads to the conclusion that Defendant
> did not knowingly choose Mr. Egbert to represent them
> in any capacity other than filing an application for
> registration.  As such, Mr. Egbert does not meet any of
> the three categories of persons who may sign a domestic
> representative form.

22

23

24

25

26

27

28

32

F&R at 10 (internal citations omitted)(emphasis added).

The Magistrate Judge appears to have operated under the understanding that designation was optional.  In 2001, when Rallo's application was filed by Mr. Egbert, designation of a domestic representative was **mandatory**, not optional.  *See supra* note 3.  According to PTO policy in 2001, Mr. Egbert **had** to file a domestic representative designation along with Rallo's trademark application.  Ms. Perrotta should have known of this requirement (or at least, Mr. Egbert should have notified Ms. Perrotta of Egbert's self-designation).  The extent to which Mr. Egbert obtained express permission to file the designation from Perrotta and/or Rallo is not relevant.  At the very least, Mr. Egbert had implied authority to file the designation.  *See Sheet Metal Workers Local Union No. 54, AFL-CIO v. E.F. Etie Sheet Metal Co.*, 1 F.3d 1464, 1471 (5th Cir. 1993) ("Under Texas agency law a grant of authority to an agent includes the implied authority to do all things proper, usual, and necessary to exercise that authority.").  Applying this principle to the standard set forth in TMEP § 604, Mr. Egbert was "[a]n attorney...who has an...implied power of attorney from the applicant or party."  E&J Gallo had the right to rely upon Egbert's designation to the extent of the trademark law.

The scope of Mr. Egbert's designation is disputed.  Rallo impliedly argues that the scope of the designation is somehow tied to Mr. Egbert's understanding of the scope of § 1051(e).  Rallo points out that Mr. Egbert never considered himself a proper agent for service of process in the district court case.  Mr. Egbert "did not contemplate binding himself as agent for

**33**

1
2
3
4

service in any but the narrowest of circumstances." According to Rallo's argument, even if Mr. Egbert properly designated himself as Rallo's domestic agent, this designation did not permit him to accept service in the district court case.

5
6
7
8
9

The scope of Mr. Egbert's designation is not a subjective inquiry. Rather, it is tied directly to the actual scope of the statutory provision. That Mr. Egbert had a different understanding of the scope and effect of § 1051(e) is not determinative.

10

11

**B.   Motion to Set Aside Default Under Rule 60(b)(1).**

12
13
14
15

Although the default judgment must be vacated for improper service, given the unsettled nature of the law interpreting section 1051(e), the alternative excusable neglect issue is appropriately analyzed.

16
17
18
19
20
21
22
23
24
25

Under Fed. R. Civ. P. 60(b)(1), a court may grant relief from default judgment in cases of "mistake, inadvertence, surprise, or excusable neglect...." Default judgments are disfavored, and cases should be decided on their merits whenever reasonably possible. *Pena v. Seguros La Comercial, S.A.*, 770 F.2d 811, 814 (9th Cir. 1985). The interest in finality of judgment "should give way fairly readily, to further the competing interest in reaching the merits of a dispute." *TCI Group Life Ins. Plan v. Knoebber,* 244 F.3d 691, 696 (9th Cir. 2001)

26
27
28

The Ninth Circuit's standard for excusable neglect has evolved over time, not always consistently, and is applied in a three-part test explicated by *Falk v. Allen*, 739 F.2d 461, 463

**34**

(9th Cir. 1994):

    (1)   whether Defendant engaged in culpable conduct that led to the default;

    (2)   whether Defendant had a meritorious defense; or

    (3)   whether reopening the default judgment would prejudice Plaintiff.

(the "Falk" factors).  A party's conduct is considered culpable "if he has received actual or constructive notice of the filing of the action and intentionally failed to answer."  *Alan Neuman Prods., Inc. v. Albright*, 862 F.2d 1388, 1392 (9th Cir. 1988).

But, in 1993, in *Pioneer Investment Services, Co. v. Brunswick Associates, Ltd.*, 507 U.S. 380, 395 (1993), the Supreme Court held that excusable neglect could encompass some <u>intentional</u> failures to act, and explained that a court should determine whether such intentional failures are excusable by examining a number of equitable factors.  The Ninth Circuit, in *TCI,* 244 F.3d at 697, examined whether the *Falk* factors and the holding from *Alan Neuman* were still valid after *Pioneer*.  *TCI* concluded these holdings were still good law, after providing some clarification of the pre-existing Ninth Circuit standards.  *See TCI*, 244 F.3d at 697-699.

*TCI* reaffirmed that a party's conduct could be considered culpable if that party "received actual or constructive notice of the filing of the action and *intentionally* failed to answer."  *Id*. at 697 (emphasis in original).  However, in light of *Pioneer*, the "intentional failure to answer" element must be interpreted narrowly.  Specifically,

    Neglectful failure to answer as to which the defendant

**35**

offers a credible, good faith explanation negating any
intention to take advantage of the opposing party,
interfere with judicial decisionmaking, or otherwise
manipulate the legal process is not "intentional" under
our default cases, and is therefore not necessarily --
although it certainly may be, once the equitable
factors are considered -- culpable or inexcusable.

*TCI*, 244 F.3d at 698-99.  The first part of *TCI*'s analysis
permits excuse from default as non-culpable if the defaulted
party offers a "credible, good faith explanation [that] negate[s]
any intention to take advantage of the opposing party, interfere
with judicial decisionmaking or otherwise manipulate the legal
process."  *Id.*

The meaning of the second part of *TCI's* holding is a matter
of considerable dispute among the parties.  Rallo contends that
the phrase "once the equitable factors are considered" demands an
equitable balancing of all three *Falk* factors in every case.  E&J
Gallo, pointing to *Franchise Holding II, LLC, v. Huntington
Restaurants Group, Inc.*, 375 F.3d 922, 926 (9th Cir. 2004) and
*American Association of Naturopathic Physicians v. Hayhurst*, 227
F.3d 1104, 1108 (9th Cir. 2000), rejoins that the three *Falk*
factors are <u>disjunctive</u> (i.e., that a district court may deny a
motion to vacate if the defendant fails to satisfy any of the
three factors).

*Franchise Holding II,* on which E&J Gallo relies*,* is an
anomalous case that does not follow precedent and was not
followed by a subsequent en banc panel of the Ninth Circuit.  A
recent district court opinion from the Central District of
California summarized *Franchise Holding II's* failures:
//
//

36

...[T]he Ninth Circuit has reached a [decision] seemingly inconsistent [to TCI] in *Franchise Holding II* []. The [*Franchise Holding II*] court stated that where a "defendant has received actual or constructive notice of the filing of the action and failed to answer, its conduct is culpable" in the context of entry of default. Although this position appears to be directly contrary to the court's position in TCI, the court engages in little analysis and fails to even mention, let alone explicitly overrule, TCI.

In addition, subsequent to *Franchise Holding II*, the Ninth Circuit once again broadly defined excusable neglect. In *Pincay v. Andrews*, an en banc panel of the Ninth Circuit upheld the district court's finding of "excusable neglect" where an attorney had delegated to a paralegal the task of calendaring the date for the notice of appeal and the paralegal misinterpreted an unambiguous rule concerning the filing deadline causing the firm to miss the deadline. Although the court recognized that a mistake of law in reading a rule of procedure "is one of the least compelling excuses that can be offered," it held that "the nature of the contextual analysis and the balancing of the factors adopted [by the Supreme Court] counsel against the creation of any rigid rule" that certain conduct is inexcusable. The court went on to find that a district court is in the best position to make excusable neglect determinations. As *TCI* gives a thorough reasoned basis for its decision, *Franchise Holding II* provides no analysis and fails to even mention *TCI*, and the Ninth Circuit again broadly defined excusable neglect after *Franchise Holding II*, the Court finds *Franchise Holding II* anomalous and unpersuasive.

*Quach v. Cross*, 2004 WL 2862285, *6 (C.D. Cal.)(internal citations omitted).  The en banc decision in *Pincay* emphasizes the importance of balancing the *Pioneer* factors and avoiding per se rules.  *Pincay v. Andrews*, 389 F.3d 853, 860 (9th Cir. 2004)(en banc).

Reliance upon *Naturopathic Physicians,* 227 F.3d at 1108, is also misplaced.  First, the case does not address *Pioneer,* which the Supreme Court decided seven years earlier.  In light of *Pincay's* reaffirmation of the importance *of Pioneer's* equitable approach, the continued viability *of Naturopathic Physicians'*

holding that the *Falk* factors are disjunctive is dubious.

Rallo, in advocating a balancing of the three *Falk* factors, implicitly suggests that a default might be excused even if, for example, the defaulting party presented no meritorious defense or, alternatively, even if the non-moving party would be prejudiced. *TCI* did not so hold. Rather, TCI suggests that where "defendant presents no meritorious defense, then nothing but pointless delay can result from reopening the judgment" but where "reopening the judgment would prejudice the plaintiff...then the interest in finality should prevail." 244 F.3d at 697. The language relied upon by Rallo simply means that the first *Falk* factor (culpability) was not dispositive and that the other "equitable" factors must also be considered.

In this Circuit, a court asked to set aside a default must determine:

   (1) Whether the defaulted party received actual or
   constructive notice of the suit?

   (2) Did the defaulted party "intentionally" failed to
   respond?  To answer this second question, a court must
   determine whether the defaulted party offered a credible
   good faith explanation that negates any intention to take
   advantage of the opposing party, interfere with judicial
   decisionmaking, or otherwise manipulate the legal process.
The party in default bears the burden of showing that the *Falk* factors counsel in favor of setting aside default. *TCI, 244 F. 3d at 696.*

//

//

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1.   **The First Falk Factor: Excusable Neglect/ Culpable Conduct**

The Magistrate Judge found Defendant had "not met its burden of proving excusable neglect":

> Standing alone, Mr. Vesco's declaration may state grounds for excusable neglect...[h]owever, when viewed in light of Mr. Egbert's deposition and the numerous letters sent to Defendant's agent regarding this action, Mr. Vesco's assertion stand contradicted.

F&R at 12.  After review of the law and the entire record, a different conclusion is warranted

**a.   Notice.**

Although Rallo contends that it did not recognize that the district court case was distinct from the administrative proceeding and demanded a separate response, Rallo nevertheless admits that it received a copy of the complaint from Mr. Egbert. Doc. 11, Vesco Decl., at ¶4.  Rallo had actual notice of the district court complaint.

**b.   Intentional Failure to Respond.**

The defaulted party must offer a credible good faith explanation that negates any intention to take advantage of the opposing party, interfere with judicial decisionmaking, or otherwise manipulate the legal process.  Courts have given weight to various considerations in this analysis, including the nature of the explanation, the defaulted parties' familiarity with legal process, and communication problems between the defaulted party and its advisers.

Here, Rallo relies primarily on the Declaration of Mr. Francisco Vesco to support its claim of excusable neglect.  Vesco declares:

39

> It was not until after I had been contacted by
> Cantine Rallo's United States distributor,
> Distillerie Stock, which had apparently received
> a "judgment of Permanent Injunction," that I came
> to appreciate that this second proceeding had
> been commenced and that Canine Rallo had some
> further obligation to defend itself.  Although
> Mr. Egbert had sent us a copy of a Summons and
> Complaint, he did not advise us this was in fact
> a second, separate proceeding, and did not inform
> us we had any need to respond to the pleading.

Doc. 11 at 17-23.

It is not disputed that Mr. Egbert forwarded a number of documents to Ms. Perrotta that should have put any English-speaking reader on notice of the risk of failing to respond to the district court complaint.  *See* F&R at 12-14.  The Magistrate Judge concluded from this evidence that Rallo "certainly should have been aware of its duty to respond, regardless of the sufficiency of the communication between Defendant and Ms. Perrotta."  *Id*.  The relevant question is not whether Rallo should have been aware of its obligations.  Even if a defaulted party "know[s] what the likely consequence [of failing to respond] will be," that failure is not necessarily "intentional." *TCI*, 244 F.3d at 697.  Rather, a court must determine whether Rallo has offered a "credible, good faith explanation [that] negate[s] any intention to take advantage of the opposing party, interfere with judicial decisionmaking or otherwise manipulate the legal process."  *Id.*  For example, in *TCI*, the Ninth Circuit reasoned that even where an attorney "knew that [a response] would be due while he was away, yet did nothing about obtaining an extension, [this] did not preclude a finding of excusable neglect."  *Id.* at 698.

The Ninth Circuit has adopted a forgiving approach to excusable neglect, accepting even "weak" reasons if they reveal

mere "negligence and carelessness, not...deviousness or willfulness." *Bateman v. United States Postal Serv.,* 231 F.3d 1220, 1225 (9th Cir. 2000).  In *Bateman*, an attorney was excused from his failure to timely file a pleading  because he had to leave the country on fairly short notice and, upon his return, suffered from jet lag and took some time to sort through his mail.  Although this was a "weak" reason, it was enough to warrant relief under Rule 60(b)(1).  Similarly, in *Pincay v. Andrews*, 389 F.3d 853, 859 (9th Cir.  2004), the Ninth Circuit examined whether a lawyer's failure to read an applicable rule could constitute excusable neglect:

> We recognize that a lawyer's failure to read an applicable rule is one of the least compelling excuses that can be offered; yet the nature of the contextual analysis and the balancing of the factors adopted in Pioneer counsel against the creation of any rigid rule. Rather, the decision whether to grant or deny an extension of time to file a notice of appeal should be entrusted to the discretion of the district court....Pioneer itself instructs courts to determine the issue of excusable neglect within the context of the particular case, a context with which the trial court is most familiar. Any rationale suggesting that misinterpretation of an unambiguous rule can never be excusable neglect is, in our view, contrary to that instruction. [T]he right way, under Pioneer, to decide cases involving ignorance of federal rules is with an elastic concept equitable in nature, not with a per se rule.

*Id*.  *See also Quach,* 2004 WL 2862285 at *7 (finding excusable neglect where defaulted party failed to respond because they felt they were improperly served).  This more lenient approach has evolved from the stricter standard that held parties liable for their own negligence or lack of diligence and specified that the remedy was against the attorney or representative.  *See Ringgold Corp. v. Worrall*, 880 F.2d 1138, 1141-42 (9th Cir. 1989); *see also Cmty. Dental Serv. v. Tani*, 282 F.3d 1164 (9th Cir. 2003)(en

banc)(holding that a default caused by an attorney's gross
negligence could be set aside under the "catch all" clause
contained in Rule 60(b)(6)).

Here, Rallo asserts that it was confused by the parallel
proceedings and failed to understand its responsibility to file a
separate response in the district court case.  Although Rallo has
not offered any evidence directly addressing the extent or
sufficiency of communications it received from Perrotta, a
communication breakdown is reasonably inferrable from the record.
For example, Francisco Vesco asserts that Mr. Egbert "did not
advise us [that the district court complaint] was in fact a
second, separate proceeding, and did not inform us we had any
need to respond to the pleading."  Vesco Dec., at ¶4.  This
directly contradicts Mr. Egbert's assertions that he sent
correspondence to Perrotta explaining Rallo's obligation to
timely respond to the district court complaint.

Communication problems are relevant to the excusable neglect
inquiry.  For example, in *Briones v. Riviera Hotel & Casino*, 116
F.3d 379, 382 (9th Cir. 1997), the Ninth Circuit excused a
litigant's failure to respond to a motion to dismiss in part
because there "may have been a communication problem within his
group of assistants."  *See also Cheney v. Anchor Glass Container
Corp.*, 71 F.3d 848, 850 (11th Cir. 1996)(finding excusable
neglect where a delayed filing was caused by a "failure in
communication between the associate attorney and the lead counsel
[and where] [t]he circumstances of the error were obviously
within counsel's control, but their noncommunication and
resulting inaction amounts only to an omission[] caused by
carelessness.").  Here, although additional evidence on the

communication problem would have been prudent and helpful, its absence is not fatal.

E&J Gallo points out that Rallo did actually communicate with Mr. Egbert directly at one point.  Under certain circumstances, this might indicate culpability.  Where a defaulting party is "generally familiar with legal processes or consultation with lawyers....[a]bsent some explanation...it is fair to expect that individuals who have previously been involved in litigation or have consulted with a lawyer appreciate the consequences of failing to answer and do so only if they see some advantage to themselves."  *TCI*, 244 F.3d at 699 n.6 (9th Cir. 2001) (emphasis added).  E&J Gallo cites two additional cases in support of this proposition, *Meadows v. Dominican Republic*, 817 F. 2d 517 (9th Cir. 1987) and *Richmark Corp. v. Timber Falling Consultants*, Inc., 937 F.2d 1444 (9th Cir. 1991), both pre-*Pioneer* cases that were approvingly cited in *TCI*.  Both cases are distinguishable on their facts.  In *Meadows* "the district court found that [foreign] defendants were fully informed of the legal consequences of failing to respond by the United States Department of State...[and were] sufficiently sophisticatd and experienced in the requirements of American law to protect its interests, based on its involvement in other actions in the United States courts."  817 F.2d at 522.  Here, nothing in the record indicates that Rallo, an Italian Company with limited business in the United States was familiar with legal processes in the United States or, apart from this case, that Rallo was or ever has been involved in litigation in the federal courts.

*Richmark* involved a Chinese company that contended it had failed to respond to a complaint because the Chinese government

**43**

refused its application for an exit visa.  937 F.2d at 1444.
But, the defendant in *Richmark* was "during [that] same
period...able to secure local counsel in the United States to
address other matters."  *Id.*  Despite not being able to secure an
exit visa, the *Richmark* court concluded that the Chinese company
could have "communicated with the court through other channels."
*Id*.  Here, in contrast, Rallo claims not to even have been aware
that it needed to communicate with the district court.  *Richmark*
is inapposite.

E&J Gallo's assertion that Rallo engaged in a "knowing
strategy to deliberately ignore legal proceedings" is
unpersuasive.  *See* Doc. 24, E&J Gallo's Opposition to Rallo's
Motion to Vacate default, at 16.  Even assuming, *arguendo*, that
Rallo understood the consequences of not responding to the
district court complaint, purposefully failing to respond to a
motion for permanent injunction makes no legal or business
sense.[13]

In further support of its argument, E&J Gallo emphasizes
that Rallo also failed to timely respond to the motion for
summary judgment in the administrative proceeding.  The exact
chronology of the administrative docket is difficult to discern
from the record, but it appears that E&J Gallo filed a motion for
summary judgment in the administrative proceeding in early April
2004, basing its motion on the fact that a preliminary injunction
had been entered against defendant based on the default in the

---

[13]    Moreover, after mailing its application to register its
mark and pursuing, even if incompetently, administrative
proceedings in the PTO, there is no conceivable explanation why
Rallo should be found to have abandoned its pursuit of the mark
on this record.

district court case.  Egbert Depo., at 93-94.  Rallo offers no
explanation who it failed to respond to the dispositive motion in
the administrative proceeding.  Rallo acknowledges that it was
required to defend the trademark proceeding.  Despite Rallo's
apparent lack of effective response in the administrative
proceeding, on July 16, 2004, Rallo moved for relief from the
administrative judgment, about the same time that Rallo moved for
relief from default judgment in district Court.  *See* Doc. 8,
filed July 12, 2004.  This is contrary to E&J Gallo's assertion
that Rallo engaged in a "knowing strategy to deliberately ignore
legal proceedings."  During the pendency of the administrative
summary judgment motion, Rallo appears to have been working to
retain a lawyer to handle the district court matter.  *See* April
19, 2004 letter from Mr. Egbert to Sergio Ardito.  Egbert Depo.,
Ex. B.  When White & Case was finally engaged, Rallo then took
action to protect itself both before the district court and the
TTAB.[14]  This suggests negligence and inattention, not a knowing

_____

[14]    Outside the context of default, a court must analyze
the length of the delay separately.  *See Pioneer*, 507 U.S. at
395.  However, under *TCI*, because the "Falk factors are...quite
sufficient after *Pioneer* [] to guide district courts' exercise of
discretion [] in the context of default judgments," a separate
discussion of the length of the delay is not technically
necessary.  Nevertheless, even in the context of default, the
length of the delay can be relevant circumstantial evidence of
culpability.  *TCI*, 244 F.3d at 698.  Here, the length of the
delay does not suggest culpability.  It is not clear from the
record when Rallo (as opposed to Egbert and Perrotta) actually
received notice of the default judgment and permanent injunction.
Although Francisco Vesco's declaration admits receipt of the
district court complaint, it implies that some time passed before
Rallo became aware of the existence of the injunction.  But,
assuming, *arguendo*, that Rallo became aware of the judgment soon
after it was entered, in late March 2004, between two and three
months passed before Rallo began to defend in the district court.
Rallo took steps to secure counsel in mid-April 2004, and Rallo's

strategy to ignore legal proceedings.

   *Pioneer* established the general principle that excusable neglect demands an equitable inquiry "taking account of all relevant circumstances..."   507 U.S. at 395.   Accordingly, some weight may also be given to the unsettled status of the law regarding the scope of 15 U.S.C. § 1051(e).   Mr. Egbert believed that service was improper, although nothing in the record proves that he communicated this belief to Perrotta or Rallo.   Egbert Depo., at 85-86.[15]

   Crediting the overarching principle that default judgments are disfavored and the law strongly prefers trial on the merits, Rallo's failure to timely respond to the complaint constitutes excusable neglect.   The delay was not unreasonably long, Plaintiff will suffer no prejudice, and the proffered "excusable" neglect, marginal as it is, negates any wrongful purpose. Although Defendant has demonstrated its apparent lackadaisical attitude toward United States legal proceedings, this does not amount to bad faith.   Communication problems with Mr. Egbert, who is subject to criticism for his apparent ineptitude, Rallo's lack of familiarity with the American legal system, and ambiguity in

new lawyer began working to set aside the default judgment on July 1, 2004, sending a letter to E&J Gallo expressing its interest in obtaining relief from default and seeking an informal resolution to the matter. Doc. 10, Ex. E.  Rallo followed this with a motion to vacate on July 12, 2004.  Doc. 8.  This is not an unreasonable delay under the circumstances, particularly given that Rallo was operating out of a foreign country.  *See* *Bateman*, 231 F.3d at 1225 (finding a delay of "a little more than one month" was "minimal" and "not long enough to justify denying relief").

   [15]   Mr. Egbert declined to disclose whether he articulated this position to anyone else, citing attorney-client privilege. Egbert Depo., at 86.

the statutory service provision all played some part in the delay.  There is absolutely no evidence that Rallo's delay was in any way designed to interfere with or manipulate the legal system.

### 2.   The Second *Falk* Factor:  Prejudice to Plaintiff.

In this case, Plaintiff has offered no evidence of prejudice beyond the effect of proceeding on the merits if relief from default is granted.  Having to try a case on the merits is not, without more, sufficient prejudice.  *See TCI*, 244 F.3d 701 ("To be prejudicial, the setting aside of a judgment must result in greater harm than simply delaying resolution of the case.").  Rather, "the standard is whether [plaintiff's] ability to pursue his claim will be hindered."  *Id*.  Plaintiff offers no suggestion that it will not be fully able to prosecute its claims.

### 3.   The Third *Falk* Factor: A Meritorious defense.

"A defendant seeking to vacate a default judgment must present specific facts that would constitute a defense.  But the burden...is not extraordinarily heavy."  *TCI*, 244 F.3d at 700.  The moving party need only assert a factual or legal basis that is sufficient to raise a particular defense; the question of whether a particular factual allegation is true is resolved at a later stage.  *See id*.

In this case, E&J Gallo claims that Defendant's use of the mark "Rallo" infringes upon its own "extraordinarily strong and distinctive mark."  Rallo asserts in defense that it will be able to prove that E&J Gallo's infringement claim is (a) barred by the doctrine of laches and (b) will fail on the merits because there

**47**

is no likelihood of confusion. The law does not require that defendant show it will prevail on its defense.

**a. Laches Defense**

"Laches is an equitable time limitation on a party's right to bring suit, resting on the maxim that one who seeks the help of a court of equity must not sleep on his rights." *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 835 (9th Cir. 2002). It is well-settled that Laches may be raised as a defense to Lanham Act claims. *Id.*

To assert a laches defense, a party must "show that it suffered prejudice as a result of the plaintiff's unreasonable delay in filing suit." *Id.* A court determines whether laches bars a claim by examining: (1) "the length of delay, which is measured from the time the plaintiff knew or should have known about its potential cause of action;" and (2) "whether the plaintiff's delay was reasonable." *Id.* The reasonableness of the delay is "considered in light of the time allotted by the analogous limitations period," and "whether the plaintiff has proffered a legitimate excuse for its delay." *Id.* The analogous limitations period applicable to Lanham Act claims brought in California is the three-year statute of limitations for fraud claims, meaning that a presumption of latches arises if a Lanham Act claim is brought more than three years after the plaintiff knew or should have known of the alleged infringement. *Id.*

Here, Rallo submits that it has been selling its wines in the United States for more than fifty (50) years. Rallo argues that "fifty years is simply too long to wait, and it is unfair now to destroy a half-century of goodwill in a brand...." Doc.

34 at 10.[16]  Rallo impliedly asserts that E&J Gallo should have been aware of Rallo's fifty-plus years of operations in the United States.  Rallo's owner and General Manager declares that Rallo's "sales in the United states have never been extraordinarily high."  Vesco Decl., at ¶2.  On the record before the court, the latches defense is viable and cannot be eliminated as a matter of law.

### b.    Defense on the Merits: No Likelihood of Confusion

To prevail on the merits of its trademark infringement claim, E&J Gallo must show that it (1) "holds a protectable mark," and that Rallo's mark is similar enough to "cause confusion, or to cause mistake, or to deceive." *Surfvivor Media, Inc. v. Survivor Productions,* 406 F.3d 625, 630 (9th Cir. 2005) (citing *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.,* 125 S.Ct. 542, 547(2004)).  The critical inquiry is whether a "reasonably prudent consumer in the marketplace is likely to be confused as to the origin of the good or service bearing one of the marks." *Id.*

---

[16]    On June 30, 2005, Rallo also submitted a letter to the court, attaching a copy of a transcript from the deposition of Jeff Bland, Vice President/General Manager of E&J Gallo's International Business Division, which allegedly reveals that Bland became aware of the existence of Rallo's wines when he purchased one of Rallo's product in Italy.  E&J Gallo objects to the district court's consideration of this supplemental evidence, on the grounds that it has not properly been made a part of the record of this case and that it mischaracterizes the record and is inherently misleading.  Doc. 54, filed July 6, 2005.  Even if the district court were to consider this evidence at this time, it is not particularly helpful to Rallo's laches defense. Assuming, arguendo, that E&J Gallo did become aware of Rallo's operations in Italy more than three years ago, such an awareness is not germane to the analysis required under *Jarrow.*

49

1    To analyze likelihood of confusion, a court must consider

2 the following eight factors:

3         (1) strength of the mark(s);

4         (2) relatedness of the goods;

5         (3) similarity of the marks;

6         (4) evidence of actual confusion;

7         (5) marketing channels;

8         (6) degree of consumer care;

9         (7) the defendants' intent;

10        (8) likelihood of expansion.

11 *Id.* (citing *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49)

12 (9th Cir. 1979). (These factors are often referred to as the

13 "Sleekcraft" factors). "The test is a fluid one and the

14 plaintiff need not satisfy every factor, provided that strong

15 showings are made with respect to some of them." *Id.*

16

17              *(1)   Strength of the Mark*

18     "The purpose of examining the strength of the plaintiff's

19 mark is to determine the scope of trademark protection to which

20 the mark is entitled. The more unique the mark, the greater the

21 degree of protection." *Surfvivor Media*, 406 F.3d at 631. E&J

22 Gallo places great emphasis on the strength of its mark, citing

23 *E. & J. Gallo Winery v. Pasatiempos Gallo S.A.*, 905 F. Supp.

24 1403, 1407 (E.D. Cal. 1994), which found that "[b]y virtue of

25 widespread sales and promotion for over half a century, the []

26 GALLO mark has become extraordinarily strong and distinctive."

27 Rallo does not here challenge the strength of E&J Gallo's mark.

28 The holding of the district court in *Pasatiempos* is not

dispositive of the outcome on the merits.

**50**

### *(2)   Marketing Channels.*

Rallo offers some evidence, in the form of information obtained from of the internet, that Marsala wines are used mostly as desert wines or for cooking.  *See* Moskin Decl. Ex. D. Although Rallo suggests, quite logically, that these wines would likely be "sold in somewhat different manner from E&J Gallo wines."  Rallo offers no specific evidence that its wines are sold through different marketing channels from any E&J Gallo wines.

### *(3)   Degree of consumer care*

Rallo similarly argues that consumers of Marsala wines would be sophisticated enough to distinguish between the allegedly conflicting marks.  Rallo offers no evidence of consumer sophistication.

### *(4)   Evidence of actual confusion*

Rallo argues that the absence of actual consumer confusion is powerful evidence that there is no likelihood of confusion. At this stage, Rallo has offered no evidence, survey-based or otherwise on the confusion issue.  E&J Gallo suggests that the only appropriate evidence of the absence of confusion is survey evidence, which has not been presented.  It has been suggested that "there are at least three types of proof of likelihood of confusion: (1) survey evidence; (2) evidence of actual confusion; and (3) an argument based on an inference arising from a judicial comparison of the conflicting marks themselves and the context of their use in the marketplace."  *Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1404 n.14 (9th Cir. 1997).  Although Rallo has not yet presented survey evidence (or any other evidence) of an absence of actual confusion, it does

present an argument based on an "inference arising from a judicial comparison of the conflicting marks themselves and the context of their use in the marketplace."

### *(5) Similarity of the marks*

Rallo suggests a number of bases for finding that the two allegedly conflicting marks, as they are used in the marketplace, are not similar.  In determining similarity, a court may draw guidance from the following three axioms:

> First, the marks must be considered in their entirety and as they appear in the marketplace.
>
> [S]econd, similarity is adjudged in terms of appearance, sound, and meaning, and
>
> [T]hird, similarities are weighed more heavily than differences,

*GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1206 (9th Cir. 2000).

Rallo offers evidence that E&J Gallo "tends not to use the name 'Gallo' alone on its products," instead preferring to use terms like "Ernest & Julio Gallo," "E&J Gallo," and "Gallo Sonoma."  *See* Moskin Decl., Ex. C; Doc. 34 at 12.[17]  This tendency is not disputed by E&J Gallo.  Rather, E&J Gallo argues that the word "Gallo" dominates the labels on Gallo wines, again citing *Pasatiempos,* 905 F. Supp. at 1407, which so held.  Again, although the holding in *Pasatiempos* is potentially persuasive authority, it is not dispositive of the factual questions presented in this case.

Rallo also points out that the words "Gallo" and "Rallo"

---

[17]    Rallo concedes that E&J Gallo has registered the mark "Gallo" alone for wines, including one that predates Rallo's 1962 registration of the mark "Rallo."  Doc. 34, at 12-13.  But, Rallo argues that these marks have been abandoned and presents evidence in support of this assertion.  *See* Moskin Decl. Ex. C.

only differ by a single letter and are no more likely to be confused than are the words "giver" and "river."[18]

Finally, Rallo notes that it makes Marsala wines, which have special legal status connecting them to a specific region of Italy, 27 C.F.R. § 4.24(b)(2), along with other distinctive Sicilian wines. E&J Gallo produces no similar varietals. Rallo suggests that the distinct nature of its wines further separates its mark from those possessed by E&J Gallo.

On balance, Rallo has presented enough evidence concerning the dissimilarity of the allegedly conflicting marks to prevent the issue of a valid defense being decided as a matter of law at this stage. Rallo has satisfied the third *Falk* factor and is entitled to have the default judgment against it **SET ASIDE.**

### C.   Plaintiff's Request for Attorney's Fees and Costs

E&J Gallo requests that the issuance of an order vacating the default judgment be conditioned on Rallo's reimbursing E&J Gallo for the costs and attorney's fees E&J Gallo incurred in seeking and enforcing the default judgment. Rallo responds that conditioning the order on the payment of fees and costs is not warranted in this case.

It is appropriate for a district court to condition its order setting aside default on the payment of fees and costs.

---

[18]   Rallo offers the alternative argument that the Rallo mark is "most naturally" pronounced with a soft "a" sound (rhyming with "hollow"). E&J Gallo responds that "it is well established that notwithstanding the rules of phonetics, there is no such thing as the correct pronunciation of a trademark." *JouJou Designs, Inc. v. JOJO Ligne Internationale*, Inc., 821 F.Supp. 1347, 1354 (N.D. Cal. 1992).

*Nilsson, Robbins, Dalgarn, Berliner, Carson & Wurst v. Louisiana Hydrolec,* 854 F.2d 1538, 1546-47 (9th Cir. 1988)("By conditioning the setting aside of a default, any prejudice suffered by the non-defaulting party as a result of the default and the subsequent reopening of the litigation can be rectified....The use of imposing conditions can serve to promote the positive purposes of the default procedures without subjecting either litigant to their drastic consequences.").[19]

In this case, Rallo received actual notice of the instant lawsuit but, whether caused by a communication failure or some other act of negligence, inadvertence, or inattention, failed to recognize the need to respond to the district court complaint. Whatever the cause, E&J Gallo incurred attorney's fees and costs as a result.  Some shifting of costs is appropriate to apprise Rallo of its responsibility to pay attention to legal proceedings in a jurisdiction in which it chooses to do business.

However, Rallo should not be responsible for fees and costs incurred after July 1, 2004.  Upon discovery of its failure to timely respond to the district court complaint, Rallo took action to protect its interests and to inform E&J Gallo of its intention to defend.  The letter sent by White & Case to E&J Gallo on July 1, 2004 suggested an amicable resolution.  Theraffter, the fees incurred by E&J Gallo to defend the default judgment were by its own choice.

---

[19]     Rallo suggests that, where a court has found a default judgment void for lack of proper service, sanctions may not be imposed upon the defaulting party.  However, Rallo does not cite any authority for this proposition, nor does it acknowledge Ninth Circuit precedent approving the practice of conditioning orders to set aside default upon payment of reasonable attorney's fees.

E&J Gallo has neglected, however, to provide any information to the court concerning the amount of the fees and costs incurred in connection with the default proceedings in the district court. Only those fees reasonably incurred prior to July 1, 2004 by E&J Gallo in pursuing default will be recoverable as a condition of setting aside the default. E&J Gallo shall submit a short supplemental brief detailing any such fees and costs incurred within ten days following electronic service. An appropriate order conditioning the vacation of the default judgment on the payment of such fees will then be entered.

## V.  CONCLUSION

For the reasons set forth above,

(1) Service upon Mr. Egbert was improper and the default judgment is **VOID**;

(2) Alternatively, even if service was proper, Defendant has established excusable neglect and the default judgment will be **SET ASIDE** on that ground;

(3) Plaintiff's request for attorney's fees and costs is **GRANTED** to the extent discussed above; Plaintiff shall submit a supplemental brief concerning fees within ten days following electronic service of this order.


**SO ORDERED.**

**Dated: August 17, 2005            /s/ OLIVER W. WANGER**

                                   _____
                                        Oliver W. Wanger
                                   UNITED STATES DISTRICT JUDGE